IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CAHABA DISASTER RECOVERY, LLC, ) <br> an Alabama Limited Liability Company, ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> LENARD E. RODGERS and ) <br> INTERNATIONAL LINING, LLC, ) <br> a Florida Limited Liability Company, ) <br>     Defendants. ) | CIVIL ACTION NO. 10-00574-KD-B |

**ORDER**

This matter came before the Court for a non-jury trial on January 5, 2012. Upon consideration of the documentary and testimonial evidence presented at trial and all other pertinent portions of the record, the Court makes the following findings of fact and conclusions of law:

**I.    Procedural Background**

On September 15, 2010, Plaintiff Cahaba Disaster Recovery, LLC ("Cahaba") filed a complaint against Defendants Lenard E. Rodgers ("Lenny Rodgers" or "Rodgers") and International Lining, LLC ("International Lining") in the Circuit Court of Mobile County, Alabama, alleging breach of contract and fraud. (Doc. 2). At the time of the filing and thereafter, Cahaba was an Alabama limited liability company with its principal place of business in Mobile, Alabama, Rodgers was a citizen of Florida, and International Lining was a Florida limited liability company with its principal place of business in Longwood, Florida. (Doc. 2 at 1; Doc. 1 at 1).

On October 15, 2010, Defendants timely removed the case to this Court on the basis of diversity pursuant to 28 U.S.C. § 1332(a). (Doc. 1). On March 9, 2011, with leave of the Court,

1

Cahaba filed an amended complaint that added a breach of warranty claim to the two claims stated in the original complaint. (Doc. 20). Defendants answered the amended complaint on March 21, 2011. (Doc. 21). Though Defendants sought and obtained an extension of the deadline for dispositive motions (Docs. 31 & 32), neither party filed any such motion, and this matter proceeded to trial on all claims.

## II.     Findings of Fact[1]

On April 20, 2010, the Deepwater Horizon drilling rig exploded in the Gulf of Mexico. The resultant oil spill threatened coastal communities from Louisiana to Florida. In an effort to protect their beaches and marshlands, certain of those communities hired emergency response companies to deploy and service offshore "boom" — floating barriers designed to arrest the movement of oil-contaminated water. Among those companies was DRC Emergency Services, LLC ("DRC"), a Mobile, Alabama-based limited liability company that engaged Plaintiff Cahaba to locate and procure oil boom to be used for DRC's projects. Cahaba entrusted much of that responsibility to David Eblen ("Eblen"), Cahaba's equipment and purchasing manager.

In late April 2010, Eblen made his first-ever purchases of small quantities of oil containment and oil absorbent boom. As their names suggest, oil containment boom ("containment boom") is designed to keep oil-contaminated water in place, whereas oil absorbent boom ("absorbent boom") is meant to extract and retain oil while repelling water. Eblen's purchases had to conform to certain specifications expressed in DRC's contracts. With respect to containment boom, those specifications were quite detailed. Conversely, the absorbent boom that Eblen was instructed to order simply had to be either five or eight inches in diameter.

---

[1] Except where otherwise indicated, the Court's findings of fact are derived primarily from the trial testimony of Cahaba's witness, David Eblen, which the Court finds to be credible.

2

On or about May 1, 2010, someone at DRC suggested to Eblen that he could procure some absorbent boom from Defendant International Lining and provided Eblen with International Lining's phone number. Eblen spoke with Lenny Rodgers, International Lining's managing partner, and inquired about the availability of eight-inch absorbent boom. After Rodgers reported that International Lining could sell 150,000 feet of eight-inch absorbent boom for $1.33/foot, Eblen sought and obtained authorization from his boss, Buddy Fuzzell, to purchase the same. After Eblen and Rodgers finalized Cahaba's order by phone, Rodgers sent Eblen a confirmation email, which stated in pertinent part:

> Dear David,
>
> It was great speaking with you this afternoon regarding the FOC Boom product. I have placed your order with our supplier and expect shipment of this to arrive in Orlando no later than Tuesday, May 4. We will then proceed to send to your location in Mobile via truck by Thursday. Please let me know if you have another location for delivery. . . .
>
> The contract price is $200,000, or $1.333 per lineal foot. Please add freight charges of $8,100 for a total price of $208,100. Please contact me below with any questions. Thank you.

(Pl.'s Trial Ex. 1). Eblen assumed, but did not confirm with Rodgers, that the "FOC Boom product" referenced in Rodgers' email was the eight-inch absorbent boom that he had agreed to purchase from International Lining.

Two days later, on May 3, 2010, Eblen requested a formal invoice from Rodgers. (Id.). After Rodgers responded via email that an invoice would be forthcoming, Eblen inquired as to when "the 150,000 feet" would be shipped and delivered. (Pl.'s Trial Ex. 8). Rodgers replied that "[p]roduct was to arrive by Wednesday but maybe Thursday." (Id.). Rodgers then attached International Lining's invoice to a subsequent email:

> Request of Payment
> For Purchase of FOC Boom Product
> 150,000 sq. ft. @ $1.33 per lineal ft. .......$200,000.00
> Freight at $8,100.00 ................................$8,100.00
> Total Price...............................................$208,100.00

(Pl.'s Trial Ex. 7; Defs.' Trial Ex. 3). Though the May 3 invoice (like Rodgers' May 1 confirmation email) mentioned only FOC boom product and made no reference to either absorbent boom or eight-inch boom, Eblen continued to assume that the product described in International Lining's invoice and the product that he ordered on May 1 were one and the same.

Shortly after receiving International Lining's invoice, Eblen asked Rodgers to "advise what the price is now for an additional 150,000 feet of 8" absorbent boom." (Pl.'s Trial Ex. 8; Defs.' Trial Ex. 5 at 11).[2] Eblen and Rodgers then spoke on the phone, and Rodgers followed up with an email that purports to memorialize the substance of the call:

> David,
>
> Per our conversation a few minutes ago, my current pricing on FOC 8" boom[3] product is at $1.75/ft. in pallet (50K) quantities plus freight. Our production rate is 50K per day starting on Wednesday, cash with order. Our pricing on containment boom product is at $23.50 w/out cable and $25.50 with cable per foot, cash with order, estimated delivery to be 10 to 14 days.

(Pl.'s Trial Ex. 9; Defs.' Trial Ex. 4). Eblen did not respond to Rodgers' email or otherwise purchase any additional products from International Lining on behalf of Cahaba.

---

[2] The parties disagree as to whether Eblen's question regarding "additional" absorbent boom indicates that Cahaba's May 1 order was also for eight-inch absorbent boom (as Cahaba contends) or referred instead to a wholly separate, potential-but-never-executed transaction that Eblen and Rodgers discussed during an undocumented telephone conversation (as Defendants claim). For the reasons set forth below, the Court accepts Cahaba's explanation and finds that Rodgers' contrary testimony on this point was not credible.

[3] Rodgers incredibly testified that the eight-inch measurement was meant to reference the size of the box that contained the boom rather than the size of the boom itself. The Court finds that Rodgers characterized the FOC product as "8" boom" in order to lead Cahaba to believe that it would receive the product it had ordered from International Lining, namely eight-inch absorbent boom.

The following morning, Eblen and Rodgers exchanged a number of emails regarding some difficulty that Cahaba encountered in wiring International Lining its $208,100 payment. (Pl.'s Trial Exs. 10-13; Defs.' Trial Ex. 5 at 34). After making a second attempt to wire the funds, Eblen asked Rodgers for "the ETA of the 150,000 feet of absorbent boom." (Pl.'s Trial Ex. 14). Rodgers responded:

> I am working on the logistics today, but should now get to you by Friday at the latest. Will work for sooner, but may be difficult.

(Pl.'s Trial Ex. 15; Defs.' Trial Ex. 5 at 34).

Rodgers asserted at trial that "the 150,000 feet of absorbent boom" mentioned in Eblen's email referred to something other than the boom that Cahaba ordered on May 1. It is clear that Rodgers' assertion is not credible. For example, on May 5, 2010, Eblen emailed Rodgers:

> Lenny,
>
> What is the ETA on the 150,000 feet? I need to let my field guys know.

(Pl.'s Trial Ex. 20). The following day, Eblen wrote to Rodgers:

> Lenny,
>
> Of the 150,000 feet, I need 12,000 of it sent to 700 Myrick Street, Pensacola, FL 32505 as soon as possible. I have Cc'd [Cahaba project managers] Bryce Fletcher and Jake Branum, so if you can include them in all correspondence, I'd appreciate it.

(Pl.'s Trial Ex. 25). Eblen's need to inform Cahaba's employees in the field about when the 150,000 feet would be delivered and his instruction to Rodgers as to where delivery should be made clearly indicate that "the 150,000 feet" referred to product that Eblen (on behalf of Cahaba) had actually ordered.

On May 4, 2010, a face-to-face meeting occurred between Eblen and two of International Lining's salesmen, Chris Rodgers and Travis Rodgers (both of whom are sons of Defendant Lenny Rodgers). The Rodgers brothers testified that, during their 20-minute meeting with Eblen

5

— which occurred after Cahaba successfully wired $208,100 to International Lining as full payment for its order — they reviewed in detail with Eblen a seven-page "brochure" they had created earlier in the day about a product called "Oil Containment Barrier" (Defs.' Trial Ex. 6) and explained to Eblen that the product described therein is what Cahaba ordered from International Lining. However, Eblen testified credibly that the brothers never offered such an explanation.[4]

On May 7, 2010, International Lining delivered 150,000 feet of boom to Cahaba. Part of the delivery was accompanied by a shipping statement that referred to 13,000 lineal feet of "FOC 8" boom product." (Defs.' Trial Ex. 8 at 3). Upon receipt of the boom, Cahaba project manager Bryce Fletcher ("Fletcher") called Eblen and said that he did not recognize and could not identify the type of product that Cahaba had received. Fletcher's colleague, Jake Branum ("Branum") emailed Eblen a photograph of the delivered product, and, within five minutes, Eblen forwarded Branum's email and photograph to Rodgers. (Pl.'s Trial Ex. 30). Eblen then called Rodgers, who explained to Eblen that the delivered product, labeled as "Rapid Oil Containment Barrier" but occasionally referred to by International Lining as "Fast Oil Containment" or "FOC,"[5] was a

---

[4] The brothers' brochure describes the "Oil Containment Barrier" as an "oil containment system designed to contain up to 100 per cent of the oil from a spill" by using "*ad*sorbent versus *ab*sorbent principles." (Defs.' Trial Ex. 6 at 1 (emphasis added)). Though it is clear from the brochure that the "Oil Containment Barrier" is not absorbent boom (eight-inch or otherwise), it is far from clear that "FOC boom" and "Oil Containment Barrier" are the same thing.

[5] Chris Rodgers testified that for marketing purposes, International Lining referred to the Rapid Oil Containment Barrier product as "FOC boom," with "FOC" standing for "Fast Oil Containment." However, the brochure that Chris Rodgers and his brother allegedly reviewed with Eblen on May 4, 2010 does not equate the two products. (Defs.' Trial Ex. 6). Additionally, without ever referencing "FOC" or "FOC boom," International Lining's website identifies only "Containment Boom," "Absorbent Boom," and "Oil Containment Barrier" (abbreviated on the website as "OCB") as carried products. (Defs.' Trial Ex. 10). However, what was delivered to Cahaba on May 7, 2010 and what was illustrated as "Oil Containment Barrier" in both the brothers' brochure and on International Lining's website is FOC boom. Compare Pl.'s Trial Ex.

"revolutionary product" that could both absorb and contain oil.  Rodgers then offered to facilitate a call between Eblen and the manufacturer of the FOC boom to explain how the product works.

Later that same day, Rodgers, Eblen, and Fletcher participated in a three-way conference call, during which the manufacturer and Rodgers both represented to Eblen and Fletcher that FOC boom absorbs oil.  Given that assurance, Eblen advised Fletcher and Branum that the FOC boom was, in fact, absorbent boom.  Cahaba then attempted, without success, to employ the FOC boom to satisfy its contracts with DRC and also to sell the boom to others responding to the Deepwater Horizon spill.

Nearly six weeks later, on June 15, 2010, Eblen informed Rodgers in an email bearing the subject line "Absorbent Boom" that the FOC boom did not meet Cahaba's needs:

> Lenny,
>
> Do you have anyone that we can sell the FOC boom to?  Nobody has bought it from us and I don't need what I can't sell.
>
> I do, however, have a need for sock boom.[6]  Do you have any in stock?

(Pl.'s Trial Ex. 34).  After Rodgers responded that International Lining was also selling and "talk[ing] about" FOC boom, Eblen sought to return the product:

> I'm sure that the FOC boom is going for more than what we paid for it.  Can I send it back to you, or do we need to work with your manufacturer to return?

---

44 (sample of FOC boom delivered to Cahaba) with Defs.' Trial Ex. 6 at 3 & 4 (photographs of Oil Containment Barrier in International Lining's brochure) and Defs.' Trial Ex. 10 at 2 (photograph of Oil Containment Barrier on International Lining's website).  Neither the brochure nor the website indicates that Oil Containment Barrier/FOC boom is available in an eight-inch size, though International Lining's shipping statement and Rodgers' email correspondence with Cahaba suggested that it was.  See Defs.' Trial Ex. 8 at 3 (shipping statement); Pl.'s Trial Ex. 9 (May 3, 2010 email from Rodgers to Eblen); Defs.' Trial Ex. 4 (same).

[6]  By June 15, 2010, Eblen had come to learn that "sock boom" was synonymous with the type of oil absorbent boom that he had previously purchased in April 2010 and that DRC's customers sought to deploy.  FOC boom is not sock boom.

7

(Pl.'s Trial Ex. 36).  Within ten minutes, Rodgers responded that International Lining would not accept any return.  (Pl.'s Trial Ex. 37; Defs.' Trial Ex. 5 at 128).  After another ten minutes, Eblen again asked Rodgers to help identify potential buyers of the FOC boom that Cahaba had received but could not use:

> Who is buying the other absorbent now?  I can't get [t]his product sold, and I'm out $200,000.  I trusted that this was a product that would move, and it isn't.  Please advise.

(Pl.'s Trial Ex. 43).  Rodgers responded that, while he "can't give out sources," he would let Eblen know if he had use for Cahaba's stockpile of FOC boom in the future.  (Pl.'s Trial Ex. 38).

On June 24, 2010, a Cahaba project manager reported to Eblen that a field test off the coast of Escambia County, Florida revealed that FOC boom effectively contains, but does not absorb, oil.  (Pl.'s Trial Ex. 41; Defs.' Trial Ex. 5 at 137; Eblen trial testimony).  Eblen relayed this finding to Rodgers in a short email:

> Lenny,
>
> I had my project manager test the FOC boom.  He advised that the product is not an absorbent but a containment boom.  He says that it works very well in a containment capacity, but that it does not absorb.
>
> Please advise.

(Id.).  Minutes later, Rodgers responded:

> David,
>
> You are correct in that it acts like a containment boom, but it also acts like an absorbent boom because the oil is almost magnetized to this material.  I can promise you that this product works and we are actively trying to sell much more of it.  It is a fantastic product and I can assure you that it will sell through for you.  Please don't give up and continue to sell it for the potential it has going for it.  We are very close to getting BP to approve this product and when that happens, you will find it much easier to move.  I will keep you posted and just keep showing people what it can do for them.
>
> Lenny Rodgers

(Pl.'s Trial Ex. 42). Eblen did not respond to Rodgers' email, and International Lining did not offer or attempt to replace Cahaba's stock of FOC boom with absorbent boom. Cahaba filed its breach of contract and fraud suit against International Lining and Rodgers approximately three months later.

### III. Conclusions of Law

#### A. Rodgers' Liability

All of Cahaba's claims are alleged against both International Lining and Rodgers. However, Alabama's limited liability company law "does not envision that either a member or a manager of a limited liability company would be liable in an individual capacity for the actions of the limited liability company." Clement Contracting Group, Inc. v. Coating Sys., L.L.C., 881 So. 2d 971, 974 (Ala. 2003). Specifically, the Alabama Code states that "[n]either a member nor a manager of a limited liability company is a proper party to proceedings by or against a limited liability company, except where the object is to enforce a member's or manager's rights against or liability to the limited liability company." Ala. Code § 10A-5-2.07 (2009). Furthermore, in discussing the liability of members to third parties, the statute provides that, subject to certain exceptions not at issue in this case, "a member of a limited liability company is not liable . . . for a debt, obligation, or liability of the limited liability company, whether arising in contract, tort, or otherwise, or for the acts or omissions of any other member, manager, agent, or employee of the limited liability company." Id. § 10A-5-3.02.

It is both clear and undisputed that, in all of his dealings with Cahaba, Rodgers acted not in his individual capacity but as International Lining's agent. See Doc. 40 at 6 (stipulating that "[a]t all times, Leonard [sic] Rodgers was acting within the line and scope of his employment as an agent of International Lining"). Cahaba has neither alleged nor proven any fact that could

9

justify piercing International Lining's quasi-corporate veil.  Accordingly, Rodgers is entitled to judgment on all counts pled against him personally.

   B.   Count 2:  Fraud

At the close of Cahaba's case, Defendants orally moved for judgment as a matter of law on each of Cahaba's claims.  The Court construed Defendants' application as a motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c), which applies in the bench trial context, rather than as a motion for judgment as a matter of law pursuant to Rule 50(a), which applies only in the jury trial context.  See Fed. R. Civ. P. 50(a)(2) ("A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.").[7]

Rule 52(c) provides:

> Judgment on Partial Findings.  If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).  Rule 52(a)(1) explains that "[t]he findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).

---

[7] There are a number of differences between the two rules and the motions made pursuant to each.  Perhaps most significantly, the Rule 50(a) rubric requires the court to draw all inferences in the nonmoving party's favor, but Rule 52(c) has no such requirement.  See United States v. $242,484.00, 389 F.3d 1149, 1172 (11th Cir. 2004) (en banc) ("In addressing a Rule 52(c) motion, the court does not view the evidence in the light most favorable to the nonmoving party, as it would in . . . a Rule 50(a) motion for judgment as a matter of law; instead, it exercises its role as factfinder.").  Additionally, the Court of Appeals reviews Rule 50(a) motions *de novo*, see Abel v. Dubberly, 210 F.3d 1334, 1337 (11th Cir. 2000), but, because Rule 52(c) motions present mixed questions of law and fact, the district court's factual findings are reviewed for clear error while conclusions of law are reviewed *de novo*.  See Veale v. Citibank, F.S.B., 85 F.3d 577, 579 (11th Cir. 1996).

As stated on the record, the Court found that Cahaba had failed to offer during its case-in-chief any evidence in support of Count 2 of the complaint, which charged Defendants with fraud. Accordingly, the Court granted Defendants' motion as to that count but declined to enter judgment as to Cahaba's breach of contract and breach of warranty claims.

    C.    Counts 1 & 3: Breach of Contract and Breach of Warranty

Under Alabama law, the essential elements of a cause of action for breach of contract are the existence of a valid contract binding the parties; plaintiff's performance under the contract; defendant's nonperformance; and damages. See, e.g., Jones v. Alfa Mut. Ins. Co., 875 So. 2d 1189, 1195 (Ala. 2003). The parties dispute neither the existence of a valid contract nor the fact of Cahaba's performance. (Doc. 40 at 3). However, International Lining contends that it did everything it was required to do under the contract and that Cahaba was not damaged by the delivery of FOC boom rather than absorbent boom. (Id.). The Court disagrees.

The Court's factual finding that the parties contracted for 150,000 feet of absorbent boom and Defendants' admission that the boom delivered to Cahaba was not absorbent (id.) undermine Defendants' position entirely. Quite simply, International Lining's tender of FOC boom did not conform to the terms of its contract with Cahaba and therefore constitutes nonperformance on the part of International Lining.

International Lining's delivery of non-absorbent boom also constitutes a breach of International Lining's express warranty that that the boom would absorb. Alabama law provides that any description of goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. Ala. Code § 7-2-313(1)(b) (2006). Contrary to the suggestion made at trial by Defendants' counsel, an express warranty need not be made in writing. See, e.g., Fleming Farms v. Dixie Ag Supply, Inc., 631 So. 2d 922, 924-25

11

(Ala. 1994) (oral representations concerning the nature and purpose of herbicide safener constituted a promise that became part of the basis of the bargain). Accordingly, the Court finds that an express warranty was made and breached by International Lining.

In support of their affirmative defenses, Defendants rely on a provision of the Alabama Uniform Commercial Code that sets forth that a buyer's acceptance of nonconforming goods precludes its right to return the goods to the seller. See id. at 4-5 (quoting Ala. Code § 7-2-607(2) (2006) ("Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured . . . .")). While the record establishes that Cahaba accepted the FOC boom by relying on Rodgers' and the boom manufacturer's representations that it would absorb oil and by waiting nearly seven weeks from the date of delivery to assess the validity of that assurance,[8] the code section relied upon by Defendants also notes that a buyer who accepts nonconforming goods does not forfeit its right to otherwise recover for a seller's breach. Ala. Code § 7-2-607(2) ("[A]cceptance does not of itself impair any other remedy provided by this article for nonconformity."). As the Eleventh Circuit explained more than two decades ago in a case that turned on an identical provision of Florida's commercial code, "the sections relating to rejection and revocation of acceptance do not limit a buyer's right to sue for damages for breach of contract." Nyquist v. Randall, 819 F.2d 1014, 1020 (11th Cir. 1987).

To preserve its right to recover damages, a buyer who has accepted nonconforming goods

---

[8] See Ala. Code § 7-2-606(1)(b) (2006) (acceptance occurs when the buyer fails to make an effective rejection after having had a reasonable opportunity to inspect the goods). As demonstrated by the fact that Eblen referred to FOC boom as "the other absorbent" as late as June 10, 2010 (Pl.'s Trial Ex. 43), Cahaba's acceptance of FOC boom was apparently made without knowledge of its inability to absorb oil.

must timely notify the seller of the breach. Ala. Code § 7-2-607(3)(a) ("The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."). Eblen's June 24, 2010 email, which was sent immediately after Cahaba discovered that the FOC boom was not absorbent, satisfies the notice requirement. The email clearly informed International Lining that testing by Cahaba revealed that the FOC boom "is not an absorbent but a containment boom" (Pl.'s Trial Ex. 41; Defs.' Trial Ex. 5 at 137), and thereby presented International Lining with an unrealized opportunity to cure the nonconformity or otherwise settle with Cahaba. See Ala. Code § 7-2-607 cmt. n.4 ("The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.") Accordingly, Cahaba has preserved its right to recover damages for International Lining's established breaches. The quantum of those damages is discussed below in Section IV.

**IV.   Damages**

The measure of damages for breach of warranty in regard to accepted goods is governed by Ala. Code § 7-2-714, which provides in pertinent part:

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount . . . .
>
> In a proper case any incidental and consequential damages under Section 7-2-715 may also be recovered.

Ala. Code §§ 7-2-714(2)-(3) (2006). Section 7-2-715 provides examples of recoverable incidental and consequential damages:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or

13

>    commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
>    (2) Consequential damages resulting from the seller's breach include:
>
>    > (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>    >
>    > (b) Injury to person or property proximately resulting from any breach of warranty.

Ala. Code §§ 7-2-715(1)-(2) (2006).

Though Cahaba's amended complaint prays for compensatory and consequential damages plus interest, costs, and reasonable attorneys' fees (Doc. 20 at 5), the parties' Joint Pretrial Document — which was incorporated by reference into the Pretrial Order (Doc. 41) — indicates that Cahaba seeks only damages in the amount of $208,100 plus interest (Doc. 40 at 11). Therefore, and in light of the fact that Cahaba has offered no evidence of its consequential damages, costs, or attorneys' fees, the Court will consider only the demand for compensatory damages and statutory interest.

International Lining is liable for the $208,100 purchase price, less the value of the FOC boom as accepted by Cahaba. See Winchester v. McCulloch Bros. Garage, Inc., 388 So. 2d 927, 928 (Ala. 1980) (purchase price is evidence of the value of the goods as warranted). The FOC boom had no value to Cahaba because it could not be deployed as absorbent boom and did not satisfy any of DRC's specifications for containment boom. (Eblen trial testimony; Pl.'s Trial Ex. 34). Accordingly, the difference between the value of the goods as warranted and the value at the time and place of acceptance is $208,100.

Additionally, Cahaba is entitled to prejudgment interest. "In diversity cases, the availability and amount of prejudgment interest is ordinarily governed by state law." AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc., 508 F.3d 995, 1001 (11th Cir. 2007); see also

Lewis v. Haskell Co., 304 F. Supp. 2d 1347, 1351 (M.D. Ala. 2004) (citing Bel-Bel Int'l Corp. v. Cmty. Bank of Homestead, 162 F.3d 1101, 1110-11 (11th Cir. 1998)).  Alabama law allows for prejudgment interest on damages for breach of contract, accruing as of the date of the breach. See Lapeyrouse Grain Corp. v. Tallant, 439 So. 2d 105, 111 (Ala. 1983) (observing that the statute allowing prejudgment interest on damages for breach of contract "has been part of Alabama law since 1852"); Ala. Code § 8-8-8 (2008) ("All contracts . . . for the performance of any act or duty bear interest from the day . . . such act, estimating the compensation therefor in money, [should have been] performed.").  Accordingly, Cahaba is entitled to prejudgment interest accruing as of May 7, 2010 (the date of International Lining's nonconforming tender) at the statutory rate of 6% per annum.  See Rhoden v. Miller, 495 So. 2d 54, 58 (Ala. 1986) ("Where no written contract controls the interest rate, as in this case, the legal rate of pre-judgment interest is six percent per annum . . . ." (citing Ala. Code § 8-8-1)); see also Murray v. Holiday Isle, LLC, No. 07-0771-WS-M, 2009 WL 3634099, at *1 (S.D. Ala. Oct. 30, 2009) (Steele, J.) ("Under Alabama law, it is well established that prejudgment interest at the default rate of 6% may be available in the breach of contract context where, as here, damages were reasonably certain at the time of breach.").

Finally, Cahaba is entitled to postjudgment interest of 0.11%.  See Ins. Co. of N. Am. v. Lexow, 937 F.2d 569, 572 n.4 (11th Cir. 1991) ("[I]n awarding postjudgment interest in a diversity case, a district court will apply the federal interest statute, 28 U.S.C. § 1961(a), rather than the state interest statute."); see also 28 U.S.C. § 1961 (2006) ("[I]nterest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."); Selected Interest Rates, Federal Reserve Statistical Release,

http://www.federalreserve.gov/releases/h15/current/ (last visited January 24, 2012) (listing weekly average 1-year constant maturity Treasury yield for week ending January 20, 2012).

## V. Conclusion

Based upon the foregoing, it is **ORDERED** that the Court finds in favor of Cahaba on Counts One and Three of its complaint insofar as those Counts are alleged against International Lining and in favor of Defendant Rodgers on all counts of the complaint insofar as those counts are alleged against him individually. It is **FURTHER ORDERED** that Cahaba is entitled to damages as set out herein.

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, Judgment shall be entered by separate document.

**DONE** and **ORDERED** this the **26th** day of **January 2012.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**